**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ENVIRONMENTAL DEFENSE, *et al.*,     :
                                     :
        Plaintiffs,                  :
                                     :
    v.                               : Civil Action No. 04-1575 (JR)
                                     :
U.S. ARMY CORPS OF ENGINEERS, *et* :
*al.*,                               :
                                     :
        Defendants.                  :

<u>**MEMORANDUM**</u>

Pending before this court is a motion for preliminary injunction [58] to bar the United States Army Corps of Engineers from proceeding with a flood control project in the St. Johns Bayou Basin and New Madrid Floodway along the west bank of the Mississippi River in the southeast "boot heel" of Missouri.  The Corps plans to begin construction on or around August 1, 2006, although it insists that the first phase of the project will involve nothing more than re-routing a drainage ditch and building a cofferdam with earthmoving equipment.  For reasons set forth in this memorandum, I have concluded that plaintiffs have a substantial likelihood of success on the merits of one of their claims that this project cannot lawfully be completed.  Because the outcome of the litigation remains uncertain, however; because the first phase of construction will inflict little injury and even less <u>irreversible</u> injury; and because the public interest favors moving this litigation along to an expeditious conclusion: I have decided to **deny** the motion for preliminary injunction **upon**

**condition** that the Corps agree to demolish the cofferdam, straighten the drainage ditch, and restore the area as nearly as practicable to its present condition if judgment is ultimately entered against it.

### Background

The project in question resurrects, and combines, two flood control projects that were first envisioned in 1954 and in 1986, respectively.  The first project, to close a quarter-mile gap in the Mississippi River levee that had been deliberately left open for the New Madrid Floodway, was approved by Congress in the Flood Control Act of 1954.  33 U.S.C. §701g.  The levee closure was never implemented because it was opposed by landowners who were concerned that it would slow drainage from the Floodway. [58-1] at 6.  The second project, a pumping station in the St. Johns Bayou Basin, was authorized in the 1986 Water Resources Development Act (WRDA), Pub. L. 99-662, but local project sponsors were unable to meet statutory cost-sharing requirements [61-1] at 5.  Serious flooding in the mid-1990s attracted renewed Congressional attention, and the combination project finally gained traction in 1996, when President Clinton designated the town of East Prairie (which lies in the St. Johns Basin flood plain) an enterprise community, and Congress authorized East Prairie to use enterprise grants to fund the St. Johns component of the project.  1996 WRDA, Pub. L. No. 104-303.

- 2 -

The New Madrid Floodway portion of the project is
immediately adjacent to the Mississippi River.  Most of the
targeted project area is located behind a riverside levee called
the "mainline" or "frontline" levee.  The New Madrid Floodway is
separated from the St. Johns Basin by a second levee, the
"backline" levee.  Large areas within the Floodway and the Basin
are subject to periodic flooding at unpredictable intervals,
resulting in damage to public utilities, disruptions in access to
towns, farms, and other facilities, and, in high-water years,
steep drops in agricultural production and with commensurate loss
of local farm revenues, the main source of income for the area.
[61] at 4.  The Floodway side of the project area tends to flood
from below (from downriver, to the south), while the lower area
of land otherwise protected by the St. Johns levee system floods
from above.  The Corps project is designed to provide flood
protection and reduce flood damage in both the St. Johns Bayou
Basin and New Madrid Floodway.

A.   The New Madrid Floodway project

The Mississippi River floods into the New Madrid Floodway
during winter and spring on essentially an annual basis.  The
Floodway was designed in 1933 to carry excess river water in a
bed parallel to the Mississippi, from approximately the
confluence of the Mississippi and Ohio Rivers to the current
disputed project area -- a 1500-foot gap between the frontline

and backline levees designed to allow water to exit the riverside Floodway and re-enter the main channel.  Even if water is not draining down from further up the Floodway, high water sometimes enters this lower end opening, causing interior flooding as the river rises.  [61-1] at 3.  When that occurs, the levee gap allows overflow flooding onto to tens of thousands of acres in the flood plain.

The New Madrid Floodway project would close the 1500 foot gap in the levee, leaving four 10-foot-diameter pipes that can be opened and closed to control water flow.  [61-1] at 4.

B.   The St. Johns project

The St. Johns portion of the project would install two massive pumps to further drain the Floodway and the adjacent St. John's Basin.  The St. Johns Basin is located further west, adjacent to the Floodway, and abuts the river channel only along its northeast face and at the extreme southern (bottom) end of the levee.  Because the southern end of the Basin is already protected by a levee with a set of control gates, the flood plain within the St. Johns structure does not experience "backwater" flooding like that occurring in the Floodway.  The St. Johns side of the project, however, drains an area significantly greater than the Floodway, so that rains that occur over the Basin when there is high water in the Mississippi River also tend to produce significant flooding at the southern end of the Basin, inside the

levee.  [61] at 3-4.  The planned pump system would help
alleviate and control flooding in the Basin.

    C.   <u>The environmental aspects of the project</u>

    The core complaint of these plaintiffs is that the New
Madrid Floodway/St. Johns Basin project would wall-off and drain
the last significant piece of flood plain that still remains
connected to the Mississippi River.  [58-1] at 1.  The 1500-foot
levee gap that would be closed by the project allows the waters
of the Mississippi River – and fish – to enter the Floodway
basin.  According to United States Fish and Wildlife Service, the
New Madrid Floodway is "unique in Missouri because it is the only
significant portion of the historic Mississippi River flood plain
still largely connected to the river."  [58-1] at 6.  There is no
dispute that late winter and early spring flooding on forest and
cropland in the project area provides valuable wildlife habitat.
Half of all the fish that use the Mississippi River rely on the
New Madrid flood plain to reproduce.  The Corps' Environmental
Impact Statement (EIS), required for any federal construction
project by The National Environmental Policy Act of 1969, 42
U.S.C. §§ 4321-4347,  praises the "diversity and abundance" of
fish in the project area.  The area also provides habitat for
hundreds of species of water-dependent birds, hundreds of
thousands of waterfowl, and "unmatched habitat for amphibians and
reptiles."  [58-1] at 10.  Many of the fish do not live in the

affected area, but instead migrate into the flood plains to mate before returning to the main river.  The mating season for fish is the high water season on the Mississippi.

The Corps plan would affect somewhere between 18,000 and 36,000 acres of wetland, [58-1] at 9-10, and the animals living therein.  It would also close off the 1500-foot opening that the fish now use for access to the Floodway, leaving the fish to navigate four ten-foot wide gates as best they can in order to gain access to whatever wetlands, or mitigation sites, remain. [58-1] at 14-15.  The Corps generally plans to keep the levee gates closed when the sump area would be flooded, blocking access precisely when habitat could theoretically be available.  In years with the most flooding, the gates would be closed during the entire or nearly the entire fish spawning season.  The Corps' second Environmental Impact Statement asserts that the gates will be open much of the time, but that claim, according to the plaintiffs, is based on the Corps' old plan.  "Under the new plan ... the gates would mostly be open only in years when the sump area is not flooded, so there would be no fish habitat available even if the fish moved through the gates."  [58-1] at 15.

D.   Project history

The Corps issued a Record of Decision (ROD), representing the agency's decision to move forward with the project, in August 2003.  Plaintiffs filed this action, challenging the ROD and the underlying 2002 Environmental Impact Statement, on September 9, 2004.  In 2005, during the course of summary judgment briefing, the Corps withdrew the ROD, [61-1] at 6-7, because it contained a significant math error affecting the number of acres of land the Corps would need to procure in order to mitigate the project's impact.  [58-1] at 8. In November 2005, the Corps issued a draft of the second Environmental Impact Statement and received public comments, including comments from these plaintiffs.  On May 23, 2006, the Corps issued a new ROD, approving the recommended plan for construction. The Corps has stated that it will not issue a Notice to Proceed with construction until at least August 1, 2006, at the earliest, and that no work will be done onsite until that notice is issued. [61-1] at 7.

E.   The first phase work that will be done beginning on August 1, 2006

Completion of the entire project would take many years.  In the current season, in the period after August 1, 2006, the Corps would be able to complete only the first phase of the project. This would involve the early stages of construction of the planned New Madrid pumping station – essentially the construction

of an earthen cofferdam and sections of the final levee
structure, allowing flood water and riverine fish species
continued access to the flood plain across a 450-foot gap.  [61-
1] at 11.  The Corps will also reroute a portion of Mud Ditch,
which conveys water from the area to the Mississippi River.  [61-
1] at 12.  Any further work would wait until well into 2007.

### Standard of Review

A four-part test governs any request for the extraordinary
relief of preliminary injunction.  This test considers: (1) the
plaintiff's likelihood of success on the merits; (2) the
irreparable injury if an injunction is not granted; (3) potential
injury to the other party; and (4) the public interest.  City Fed
Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746
(D.C. Cir. 1995).  The D.C. Circuit's test is a flexible one.
"If the arguments for one factor are particularly strong, an
injunction may issue even if the arguments in other areas are
rather weak."  Id. at 747.  Even under the sliding scale, the
burden remains on the plaintiff to demonstrate that all four
factors are met.  Mova Pharm. v. Shalala, 140 F.3d 1060, 1066
(D.C. Cir. 1998).  The Court of Appeals has also emphasized the
importance of demonstrating at least some injury, because "'the
basis for injunctive relief in the federal courts has always been
irreparable harm.'"  CityFed Fin. Corp., 58 F.3d at 747.

**Analysis**

At the center of this case are broad challenges to the environmental suitability of the Corps project.  The instant motion for preliminary injunction, however, focuses on four legal issues whose relationship to those central issues is somewhat tangential: the Corps' use of a 2.5 percent discount rate in its cost/benefit analysis; the Corps' failure to require cost-sharing for the levee closure; the Corps' intent to begin construction of the levee closure without having specifically identified mitigation sites; and the Corps' timing for acquisition and construction of mitigation sites.

A.   Likelihood of success on the merits

Each of the four issues presented by plaintiffs' motion for preliminary injunction is addressed below.  Plaintiffs have demonstrated a substantial likelihood of success on the merits of the first issue.

I.   The Corps' use of a 2.5 percent discount rate to make project economics "work"

The economic analysis the Corps applies to any construction project, [1] at 17, is very sensitive to the percentage rate of interest, expressed as a discount rate: the lower the discount rate, the higher the benefit/cost ratio.  The Corps' grounded its decision to proceed with the levee closure – and its rejection of less environmentally damaging project alternatives – on its judgment that the levee closure project has a positive

- 9 -

benefit/cost ratio.  Plaintiffs allege that, but for the Corps'
use of an inappropriately low discount rate, the Corps would have
had to reject this project as well.  [58-1] at 20.

The 2.5 percent discount rate was drawn from the original
Floodway gap closure plan for which funds were appropriated a
half-century ago.  [58-1] at 20-21.  The Corps justifies its use
– producing for this project razor thin, but positive,
benefit/cost ratios of 1.02 and 1.01 to 1 – by relying upon what
it says is a long-standing policy that, for projects that have
received construction appropriations, it will continue to use the
interest rate that was first used to economically justify the
project to Congress.  [61-1] at 20.[1]

Tacitly acknowledging that there is no legal requirement for
Corps of Engineers projects to make actual economic sense,
plaintiffs instead advance the conventional legal argument that
what the Corps calls its long-standing policy is in violation of
§ 80 of the 1974 Water Resources Development Act (1974 WRDA), 42
U.S.C. § 1962d-17, which requires that

> the interest rate formula to be used in plan formulation and
> evaluation for discounting future benefits and computing
> costs by Federal officers, employees, departments, agencies,
> and instrumentalities in the preparation of comprehensive
> regional or river basin plans and the formulation and
> evaluation of Federal water and related land resources
> projects shall be the formula set forth in ... [] 33 F.R.

---

[1]  The Corps does not say that it would use the original
discount rate if interest rates had <u>fallen</u> in the past fifty
years.

> 19170; 18 C.F.R. 704.39 [] .... Every provision of law and
> every administrative action in conflict with this section is
> hereby repealed to the extent of such conflict.

The named regulation, in turn, requires that the interest rate be

tied to the yield on government bonds.  18 C.F.R. 704.39.

Subsection 80(b) of the 1974 WRDA makes it clear that, unless a

limited grandfather clause applies, this formula is also to be

used for re-evaluations of prior-authorized projects.  The

grandfather clause applies only if local sponsors gave

"satisfactory assurances" of meeting their cost-share prior to

1969, and, even in such a case, the applicable interest rate is

to be that used in 1968, rather than the rate used at the time of

project authorization. 42 U.S.C. § 1962d-17(b).  The Corps has

not claimed that the limited grandfather clause is applicable

here, nor could it, since the local sponsors opposed the levee

closure and the grandfather clause could not, under any

circumstances, justify the 1954 rate of 2.5 percent.  [58-1] at

21.

The Corps counters that it is in full compliance with the

1974 WRDA, based on an oddly worded notation added to the 1977

WRDA, which reads:

> It is hereby _reiterated_ that the interest rates or rates of
> discount to be used to assess the return on the Federal
> Government's investment in projects of the United States
> Army Corps of Engineers or the Department of the Interior
> Bureau of Reclamation, shall be those interest rates or
> rates of discount established by Public Law 93-251, the
> Water Resources Development Act of 1974, _or by any prior law_
> _authorizing projects of the United States Army Corps of_

- 11 -

> Engineers or the Department of the Interior Bureau of
> Reclamation.

Public Works Employment Act of 1977, Pub. L. 95-28, Sec. 204, 91
Stat. 116 (emphasis added).  The Corps asserts that the 2.5
percent discount rate was established by "prior law authorizing
projects of the United States Corps of Engineers," namely, the
Flood Control Act of 1954.  [61-1] at 21.

Plaintiffs' rejoinder is to point out that the 1954
authorization does not actually establish an interest rate for
the project.  Flood Control Act of 1954, Pub. L. 83-780, 68 Stat.
1256.  [58-1] at 23.  Plaintiffs further note that the Corps
itself has recognized that there are certain projects in which
the government specifically legislates the applicable interest
rate – "water supply, recreation and irrigation" – and that in
all other cases, the § 80 rate applies.  [58-1] at 25.  Because
this is not one of the projects for which Congress legislated a
specific rate, even the Corps' own guidance would require the use
of the § 80 interest rate.  Not so, insists the Corps, resorting
to legislative history to show that, while Congress said in 1977
that the new law only "reiterate[d]" the 1974 law, it actually
amended it to allow the use of interest rates from the time of
the project's initial authorization.  [61-1] at 21-22.

This Corps argument is a bridge too far.  If it were
accepted, it would operate to grandfather the interest rates of
all previously authorized projects, making a nullity of

subsection 80(b)'s limitation of grandfathering to those projects that had "satisfactory assurances" of local cost sharing prior to 1969 and limiting the interest rates even in those cases to the rates applicable in 1968.  The argument is refuted by the plain language of the statute, directly contradicts the stated intent of the sponsors and champions of both the 1974 and 1977 bills, and contradicts the consistent application and enforcement of the limited grandfather clause of the 1974 law by courts that have considered it.  See Johnston v. Davis, 698 F.2d 1088, 1093-1094 (10th Cir. 1983)(applying 1974 grandfather test and examining whether local sponsors had provided "satisfactory assurances" that they would pay their share); EDF v. Marsh, 651 F.2d 983, 1001-03 (5th Cir. 1981)(reversing Corps for violation of § 80); Burkey v. Ellis, 483 F. Supp. 897, 907-09 (N.D. Ala. 1979) (same).  [58-1] at 23-24.

The use of an invalid discount rate to justify a project requires that an ROD be set aside.  See Oregon Natural Resources Council v. Marsh, 832 F.2d 1489 (9th Cir. 1987); Johnston v. Davis, 698 F.2d 1088, 1095 (10th Cir. 1983); EDF v. Marsh; 651 F.2d 983, 1001-05 (5th Cir. 1981)(enjoining waterway for violation of § 1962d-17(d) absent preparation of new EIS).

Plaintiffs appear to have a strong likelihood of success on the merits of this first argument.

ii.  The Corps' failure to require cost-share for the
     levee closure.

The 1986 WRDA required that, for all construction projects,
a local, non-federal sponsor contribute at least 25 percent of
project costs.  Section 103 of Pub. L. 99-662, 100 Stat. 4084, as
amended by § 333 of Pub. L. 102-580, 33 U.S.C. § 2213.  With the
exception of three inapplicable projects, grandfathered by name,
a Corps project will not be approved for implementation unless
non-federal sponsors agree to contribute to project costs.
Congress applied the cost-share requirement to "any project . . .
on which construction was not initiated before April 30, 1986,"
and to any "separable element" of any previously authorized
project not begun by that date.  A "separable element" is any
portion of a project

> (1) which is physically separable from other portions of the
> project; and (2) which — (A) achieves hydrologic effects, or
> (B) produces physical or economic benefits, which are
> separately identifiable from those produced by other
> portions of the project.

33 U.S.C. § 2213(e)(1).

In this case, the local levee district (the local sponsor)
refused to pay its share of project costs.  [58-1] at 26.
Congress authorized East Prairie to use other federal funds to
pay its cost-share for the pumps portion of the project, but it
retained the cost-share requirements for the New Madrid levee
closure.  See WRDA, Pub. L. No. 104-303 § 331, 110 Stat. 3718.
In plaintiffs' submission, the Corps' failure to require cost-

- 14 -

sharing for the closure of the levee gap is a violation of the 1986 WRDA.

The Corps' response is to argue that the construction piece that will close the levee gap is not a "separable element" but an inseparable, holistic part of the entire Mississippi River levee system, a feature of the Mississippi Rivers & Tributaries (MR&T) Project, which was authorized long before 1986 by the Flood Control Act of 1928 (with authority for the Floodway gap-closing project granted under the Flood Control Act of 1954, see 33 U.S.C. § 702a).  [61-1] at 23-24.  For this argument, the Corps places its principal reliance on spotty legislative history that, it says, suggests that Congress did not intend the 1986 WRDA to apply to authorized MR&T construction.  [61-1] at 25-26.  In the 1986 WRDA, however, Congress specifically exempted three, and only three, projects from the 25 percent local cost sharing  – the Yazoo Basin Demonstration Erosion Control Program, authorized by Public Law 98-8, and the Harlan, Kentucky and Barbourville, Kentucky elements of the project authorized by section 202 of Public Law 96-367.  Congress obviously knew how to exempt projects from the 1986 WRDA, and how to do so explicitly.  It did not do so for unnamed MR&T projects.

If the legislative history does not support its argument, the Corps goes on to argue about the meaning of the statutory definition of "separable element," asserting that a new 1500-foot levy section is not "physically separable" from the main levee

(which has done without it for 70-plus years), and that its function (which is to <u>change</u> the original, planned function of the levee gap) does not "achieve[] hydrologic effects . . . separately identifiable from those produced by other portions of the project."  Plaintiffs naturally argue the contrary propositions, but the dispute quickly, and rather confusingly, becomes more metaphysical (is a new levee section separable before it is built?  after it is built? when should separability be adjudicated?) than hydrological.  At oral argument, to its credit, the Corps disclaimed entitlement to <u>Chevron</u> deference on this point, although an agency position based upon expertise about hydrologic effects might at least be considered within the bounds of reason.

The "separable element" question cannot be reliably decided on the record now before me and is unlikely to be dispositive in any case.  At this point, on this question, neither side can successfully claim a greater likelihood of success on the merits than the other.

iii.  <u>The Corps' decision to proceed with construction</u>
<u>without identifying mitigation</u>.

The plaintiffs' third claim is that the Corps will violate WRDA and the Clean Water Act if they begin construction of the levee closure before they have identified mitigation sites.  The claim is based on language in § 313 of the Clean Water Act, which requires that the government, in constructing projects, "comply

with ... Federal ... requirements ... in the same manner, and to the same extent as any nongovernmental entity."  The Corps generally requires a private party seeking a § 404 permit to provide detailed plans identifying specific mitigation sites before obtaining a permit.  In this case, the EPA notified the Corps that:

> [t]he success of a wetland mitigation effort relies heavily on its location in the watershed ....  Without that information, it is impossible to reach any conclusions on the ability of the mitigation to offset wetland impacts of the proposed project ....  Our confidence in the proposed mitigation is further eroded given current mitigation backlogs for other Corps projects in the lower Mississippi River valley.... [T]his level of information regarding mitigation is no different than normally required by the Corps of the thousands of permit applicants … under the Clean Water Act Section 404 regulatory program.

[58-1] at 38.

The Corps, in many cases, does require that specific mitigation sites be identified by private parties prior to permit issuance, and the Corps' own 2002 guidance document appears to require similar steps from the Corps itself,  see [58-1] at 34 n.18.  The same guidance contains language that cuts the other way, however, see [61-1] at 29, and the Corps does not appear to have a hard and fast rule on this subject.  "Regulatory guidance letters," which are issued without notice and comment and do not purport to change or interpret the regulations applicable to the section 404 program, [61-1] at 36, are not binding, either upon permit applicants or Corps District Engineers.  Cf. Hobbs v.

United States, No. 90-1861,1991 WL 230202 *7 (4th Cir. Nov. 25, 1991) (unpublished opinion).

On this issue, bearing in mind that ultimately the plaintiff will have the burden of proof, the odds of success on the merits favor the Corps.

        iv.  <u>The Corps' decision to proceed with construction without timely acquiring and constructing mitigation</u>.

Plaintiffs' final claim is that the Corps plans to build nearly all of the New Madrid levee closure, and possibly both pumping stations, before identifying and acquiring all but a tiny fraction of the needed mitigation, which would violate § 906 of the 1986 WRDA, 33 U.S.C. § 2283(a)(1).  Section 906 establishes separate timing requirements for the acquisition and construction of mitigation lands.  For any project "which necessitates the mitigation of fish and wildlife losses, including the acquisition of lands or interests in lands to mitigate losses to fish and wildlife," such mitigation, including acquisition of the lands or interests

       (A) shall be undertaken or acquired before any construction of the project (other than such acquisition) commences, or
       (B) shall be undertaken or acquired concurrently with lands and interests in lands for project purposes (other than mitigation of fish and wildlife losses),
whichever the Secretary determines is appropriate, except that any physical construction required for the purposes of mitigation may be undertaken concurrently with the physical construction of such project.

33 U.S.C. § 2283(a)(1).  Plaintiffs thus assert that the Corps must acquire all the mitigation lands for the levee closure at the same time it acquires land for constructing the closure, and that the Corps must construct the mitigation concurrently as it constructs the levee.  [58-1] at 37.

The Corps responds that the project has been undertaken in accordance with the subpart (B) option, and that real estate acquisition has commenced both on lands required for the project works and on the much greater area required for mitigation.  [61-1] at 32.  Further, the Corps states that it is engaged in a process that will result in concurrent work on, and completion of, the project and its required mitigation, and that there is no dispute about those material facts.  [61-1] at 37.  The Corps believes that that is all that the statutory provision requires, [61-1] at 32, and this appears to be a reasonable reading of the statutory command – making it unlikely that plaintiffs will succeed on the merits of this claim.

B.   Plaintiffs' claim of irreparable injury.

"[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often ... irreparable."  Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  Where "such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  Amoco Production Co., 480 U.S. at 545.  Because of the irremediable nature of many

- 19 -

environmental claims, courts have been wary of even relatively
modest environmental harm.  See, e.g., Fund for Animals v. Clark,
27 F. Supp. 2d 8 (D.D.C. 1998)(enjoining controlled bison hunt
that would kill only 8 percent of the wild population pending
NEPA compliance); Fund for Animals v. Norton, 281 F. Supp. 2d 209
(D.D.C. 2003) (enjoining hunt of 14 percent of mute swan
population, even where size of hunt would be reassessed
annually).

Here, the plaintiffs assert that project construction will
cause several forms of irreparable harm.  First, there will be
direct environmental harm.  There is a significant dispute
between the experts on this point: there may be substantial loss
of fish and wildlife resources and diminished habitats in
southeast Missouri (plaintiffs), or the losses will be neither
significant nor simultaneous with the preliminary project
construction (the Corps).  Second, plaintiffs assert that, once
the Corps commences this project, its expenditures on the project
will prejudice the exploration of more environmentally benign
project alternatives.  Third, plaintiffs state that NEPA
prohibits "any irreversible and irretrievable commitments of
resources" absent a proper environmental and economic analysis
and a proper analysis of alternatives, 42 U.S.C. §4332(2)(C)(v),
and the legal violations set forth above, including the flawed
benefit/cost analysis, may have resulted in an invalid selection
of alternatives under NEPA and the Clean Water Act.  [58-1] at

41.   "The more time and resources [the agency is] allowed to invest in this project, the greater becomes the likelihood that compliance with Section 102 of the NEPA, and the reconsideration of the project in light of the provisions of Section 101, will prove to be merely an empty gesture." EDF v. TVA, 468 F.2d 1164, 1183-84 (6th Cir. 1972).  Plaintiffs assert that, by pursuing this project, the Corps will prevent consideration of an alternative that would actually alleviate East Prairie's flood problems – the premise for the project's resurrection in 1996. [58-1] at 42.

The environmental damage that plaintiffs fear most is the substantial loss of habitat for birds and fish that closure of the levee will bring about, and the loss of access to the flood plain by fish that must navigate 10-foot diameter pipes (if the floodgates are not indeed closed during the critical mating season for fish).  These effects will not be felt for at least a year from now, and perhaps farther into the future.  In the short run, the irreparable injury dispute is only about fish, and it involves quite theoretical questions about whether cofferdam construction will produce too much turbidity for the fish and whether narrowing the levee gap will increase water flow rates that will be difficult for the fish to deal with.  It seems self-evident that reducing the width of the levee gap from 1500 feet to 500 feet will have some effect on the annual migration of fish

to the flood plain, but that effect is not reliably calculated or predicted on this record.

Proceeding with construction phase will indeed bring about "irreparable injury" in the technical sense, but not enough to warrant the issuance of an injunction to stop the first, earth moving phase of construction.

C.   Balance of harms.

In determining whether or not to grant a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co. v. Gambell, 480 U.S. at 542.  One factor in this balancing is the harm to the non-moving party.

Plaintiffs assert that the harm to the Corps, if the preliminary injunction is granted, is negligible.  Compared to the 70-plus years that have passed since the inception of the MR&T projects, the delay caused by a preliminary injunction would be insignificant.  Ninety percent of the project's calculated benefits come from increased crop production in the flood plain, but the frequently flooded farmland in the project area is already highly productive and only slightly less valuable than well-drained farmland would be.  [58-1] at 43.  It is not clear, indeed, whether the project will ever accomplish its major stated purpose, which is to alleviate or protect against the flooding of East Prairie.  [58-1] at 43.  And it is not clear that a

- 22 -

preliminary injunction would delay the ultimate operation of the project, since, even absent an injunction, the Corps concedes that the project could not be operated before it finalizes its mitigation plans, identifies and acquires thousands of acres mitigation sites and constructs mitigation.  Counsel for the Corps has admitted that these tasks will take years to complete. Proceedings of May 31, 2006.  The Corps has a substantial mitigation backlog from other projects on the lower Mississippi River, and mitigation sites normally take years to acquire. Thus, the time needed to complete mitigation, rather than an injunction from this Court, may ultimately prevent project operation.

More or less conceding all of those points, the Corps asserts that the harm an injunction would cause would be economic.  Because of price escalation, the Corps asserts, even a one-month delay of the construction start date would increase the project cost, just for construction of the coffer dam, by $250,000.  [61-1] at 36-37.  That amount of money is significant,[2] but it cannot be said to be more important than the disruption to wildlife that the first phase of construction will cause.

The balance of harms factor appears to be in equipoise.

---

[2]  Also significant, presumably, would be the cost of re-straightening Mud Ditch and leveling the cofferdams that the Corps plans to begin building, if the case is ultimately resolved in plaintiffs' favor, but it will be up to the Corps to calculate that cost and its risk of having to incur it.

D.   <u>The public interest</u>.

Each sides asserts that its position is in the public interest.  Plaintiffs argue that the public interest does not favor wasting taxpayer dollars on a water project that may not be economically justified; that there is a "strong public interest in meticulous compliance with the law by public officials," <u>Fund for Animals v. Espy</u>, 814 F. Supp. 142, 152 (D.D.C. 1993); and that Congress has decreed that the public interest demands the avoidance of "irreversible and irretrievable commitments of resources" before conducting a proper economic and environmental analysis, NEPA, 42 U.S.C. §4332(2)(C)(v).

The Corps' public interest argument focuses on the burden of further delay, citing comments by state congressional representatives, the City of East Prairie, members of the drainage district, the National Association for the Advancement of Colored People (Charleston, Missouri Chapter), and other community members about anticipation of the projects' benefits, to agriculture, to the local economy, and to Big Oak Tree State Park.

Neither side has mentioned the public's interest in seeing that environmental litigation – all litigation, for that matter – is resolved straightforwardly, as quickly as possible, and on the basis of the real issues that are in dispute.  The litigation of environmental cases often seems, at least to the undersigned judge, like Kabuki theater – rigidly formal, highly symbolic, and

nearly impossible for anyone but experts to understand.  Delay
seems to be the weapon of choice for plaintiffs in environmental
cases – if a project can be delayed, better evidence may be
developed on the merits, or the project may become economically
infeasible, or someone might be elected who will stop it.[3]  In
this particular case, the Corps comes into court apparently
dubious itself about the merits of the New Madrid Floodway/St.
Johns Basin project, but resolved to press on, perhaps for
"political reasons."  Comments by defense counsel – Proceedings
of June 30, 2006.  A preliminary injunction might indeed serve
some of the purposes of both sides, delaying the day of reckoning
another year (for the plaintiffs) while appeals are pending, and
removing political pressure (from the Corps) to get started with
the project, because "the judge did it."  Neither purpose,
however, is in the public's interest.

                    *     *     *     *     *

      At the oral argument of this motion, I urged plaintiffs to
tee up the real environmental issues in this case with a prompt
motion for summary judgment, which I undertook to decide
expeditiously.  The motion for preliminary injunction will be
**denied** if, before issuing its Notice to Proceed, the Corps files
its formal, written undertaking that it will completely remove

---

      [3] "Or," as the old joke has it, "the horse may talk."

any levee closure that it has built and return Mud Ditch to its

present course if it is ultimately unsuccessful in this case.


                        JAMES ROBERTSON
                  United States District Judge